NOT DESIGNATED FOR PUBLICATION

Nos. 118,826
118,827
118,828

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of J.P.P., J.J.P., and J.P.,
Minor Children.

MEMORANDUM OPINION

Appeal from Dickinson District Court; BENJAMIN J. SEXTON, judge. Opinion on remand filed
November 9, 2018. Affirmed.

*Jennifer L. Dahlstrom*, of Dahlstrom Law Office, LLC, of Salina, for appellant natural mother.

*Daryl E. Hawkins*, assistant county attorney, for appellee.

Before ATCHESON, P.J., HILL, J., and STUTZMAN, S.J.

PER CURIAM: On December 17, 2015, the State filed petitions in the Dickinson
County District Court seeking findings that J.P.P and J.J.P. were children in need of care.
The district court adjudicated those children as in need of care on February 2, 2016. A
petition asking for the same finding with respect to J.P. was filed on June 8, 2016, and a
week later the district court placed J.P. in temporary custody of the Department for
Children and Families (DCF). J.P., however, was not adjudicated as a child in need of
care until August 15, 2017. In November 2017, the district court entered orders
terminating the parental rights of the mother, M.P., to all three children. She timely
appeals those orders.

1

This is the second time we have visited this appeal. After review of the briefs and the record, we remanded this case to the district court for more specific findings in support of its conclusions of law. The district court promptly prepared and filed its revised findings of fact and the parties, after considering the revised findings, waived the opportunity we had offered for supplemental briefing. We now take up the merits.

M.P. presents three issues for our review: (1) There was not clear and convincing evidence supporting the district court's finding that she was unfit; (2) the district court erred in finding that termination of her rights was in the children's best interest; and (3) the district court erred in finding that public agencies made reasonable efforts to rehabilitate the family. Because we find no error by the district court, we affirm.

FACTS AND PROCEDURAL BACKGROUND

Drawn from the district court's revised findings and supplemented by the record, these facts provide the basis for our evaluation of the district court's conclusions. On December 16, 2015, case workers from DCF called law enforcement to a residence in Abilene because of concerns about the environment in which children in the home were living. The DCF representatives told the officer they had been at the home on December 8, 2015, saw the condition of the residence, and gave the family a week to bring the home up to standards acceptable for children to live there. As the officer walked through the residence, he saw dog feces and garbage inside and experienced an odor that forced him outside several times during the walk-through. Living in the house at that time were: M.P. with her children J.P.P. and J.J.P.; M.P.'s mother and aunt; and M.P.'s sister with her two minor children.

The State took custody of J.P.P. and J.J.P. based on the conditions of the home and filed a petition in the Dickinson County District Court on December 17, 2015, asking that J.P.P. and J.J.P. be adjudicated as children in need of care. The district court held a

2

temporary custody hearing and ordered that J.P.P. and J.J.P. remain in State custody with out-of-home placement. Near the end of December, M.P. entered into a case plan with Saint Francis Community Services (SFCS), the private entity contracted by DCF for case planning, management, and supervision. The case plan goal was reintegration of the children with M.P., with numerous tasks for M.P. to accomplish toward that end. M.P. told SFCS that the family had created a chore chart to help ensure regular cleaning for a safe living environment for the children. M.P. worked as a dishwasher at a restaurant but at minimum wage with only minimal hours.

On February 2, 2016, M.P. submitted a no-contest statement in response to the allegations in the State's petition, providing the basis for adjudication of J.P.P. and J.J.P. as children in need of care. An inspection of the home a few weeks later showed cleanliness improved from the condition in December and clutter had been reduced. The improvement was mitigated, however, by an infestation of cockroaches. Nonetheless, in recognition of the progress, the district court lifted an earlier prohibition on visits in the home. As a means of trying to improve M.P.'s parenting skills, SFCS decided to provide the Strengthening Families program during M.P.'s visits. SFCS also agreed to bear half the cost for Orkin to provide extermination services for the cockroach problem.

By the end of March 2016, M.P. had also completed the first of two sessions for the parenting psychological evaluation that was a task on her case plan. The district court noted that John H. Fajen, Ph.D., the clinical psychologist who performed the evaluation, found M.P. may always need some family or government subsidy program to live on her own with her children, and she may or may not ever be able to function totally on her own as a single individual or as a single parent alone with her children. Dr. Fajen considered that M.P. needed job training and commented that she understood the restaurant job would not provide a sufficient source of support for her and her children, meaning other employment would need to be found.

On June 8, 2016, M.P. gave birth to a full-term baby at her home. M.P. represented she was unaware of the pregnancy. Law enforcement were contacted and assisted with the birth at the residence, after which M.P. and the baby, J.P., were taken to a hospital. Given the circumstances, M.P. had obtained no prenatal care and was not prepared for the introduction of a newborn into the home. The State filed a child in need of care petition concerning J.P. on the day of the child's birth and the district court, also on the same day, ordered J.P. into the custody of DCF. Staff at the hospital expressed concerns that M.P. did not seem able to understand the concepts she was being shown, requiring continual repetition. At a temporary custody hearing for J.P. a week later, the district court continued custody with DCF and, along with conditions to be followed by M.P., ordered SFCS to arrange supervised visits.

Within a month after J.P.'s birth, SFCS observed a decline in M.P.'s parenting skills, potentially attributable to fatigue, and saw the outside of the residence deteriorate, with trash and dog feces that attracted a significant number of flies. During the supervised visits, SFCS provided instruction to M.P. about how to interact with the children, how to feed them nutritious meals, and how to clean them. During a visit with J.P., the newborn, about three weeks after the birth, M.P. was feeding J.P. J.P. began to choke and M.P. did not react to the baby's situation. SFCS staff needed to tell M.P. to stop feeding J.P., prop her up, and pat her on the back so she could stop choking and breathe. SFCS staff also observed that M.P. did not appear to know how to change J.P.'s diaper and required instruction to reclean the infant to thoroughly remove all feces.

During a case plan meeting at the end of June 2016, M.P. was directed to find other housing, since her mother had in the past been substantiated for neglect and DCF policy prohibited placing children in a home where her mother lived. M.P. was also told to contact a vocational rehabilitation office to obtain services. In August 2017 the court adjudicated J.P. a child in need of care.

Near the end of September, the district court made findings of continuing struggles by M.P., whose parenting skills appeared to have declined further, as shown by deferring parenting tasks to other adults and failing to keep her children appropriately clean, considering their activities. The chore chart had been taken down and resistance surfaced to removal of clutter and garbage around the residence, which connected with the need to have monthly exterminator visits.

At a review hearing with the district court on November 15, 2016, SFCS first stated the opinion that reintegration with M.P. was not possible. The district magistrate found that M.P. was complying with some aspects of her case plan, but "was still not maintaining a clean and stable home for the minor children." In addition to the unsanitary conditions at the home, M.P. had not applied for vocational training or worked toward obtaining public housing.

By January 2017, SFCS reported to the court that M.P.'s parenting skills were suffering further, as she relied on others to fill that role for her children. SFCS expressed further doubt to the court that M.P. could meet the basic needs of the children—and probably her own needs—even if she were to gain independent housing, away from family support.

At some point in April 2017, M.P. moved to Salina to live with her boyfriend and other friends. On or about June 5, 2017, M.P. contacted SFCS and told them the children's plan must be faxed to the housing authority that day or she would lose her spot. The district court found that since the plan was not faxed within the 12-minute period remaining, M.P. did, in fact, lose her spot. Although SFCS gave her a copy of the case plan and urged her to reapply, she moved back home with her mother, aunt, and sister,

On July 20, 2017 the district magistrate judge heard evidence on the continued viability of reintegration of the three children with M.P. After hearing testimony on

5

behalf of both the State and M.P., including M.P.'s own testimony, the court found reintegration with M.P. was no longer viable and directed the State to file a motion for termination of M.P.'s parental rights. The district court judge heard testimony and argument on that motion on October 2, 2017, and entered an order terminating M.P.'s parental rights to J.P.P., J.J.P., and J.P. We include additional facts from the record as relevant to our review.

ANALYSIS

K.S.A. 2017 Supp. 38-2269(a) establishes the decisions to be made by a district court in considering a motion to terminate the rights of a parent:

> "When the child has been adjudicated to be a child in need of care, the court may terminate parental rights or appoint a permanent custodian when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future."

That section also lists nonexclusive factors the court must consider in every case when evaluating unfitness, with an additional list to be considered when a child is not in the parent's physical custody. K.S.A. 2017 Supp. 38-2269(b) and (c). Any one of the factors in K.S.A. 2017 Supp. 38-2269(b) or (c) may, on its own, be sufficient to establish grounds for termination of parental rights. K.S.A. 2017 Supp. 38-2269(f). After finding a parent is unfit, "the court shall consider whether termination of parental rights as requested in the petition or motion is in the best interests of the child," giving primary consideration to the physical, mental, and emotional needs of the child. K.S.A. 2017 Supp. 38-2269(g)(1).

The district court found M.P. was unfit in part due to "her mental deficiency" but "also due to her lack of effort to adjust to conditions, her failure to assure care of the

6

children in the parent's home when able to do so, and her failure to carry out a reasonable plan approved by the court." See K.S.A. 38-2269(b)(1), (b)(8), (c)(1), and (c)(3).

*Standard of Review*

> "When this court reviews a district court's termination of parental rights, we consider whether, after review of all the evidence, viewed in the light most favorable to the State, we are convinced that a rational factfinder could have found it highly probable, *i.e.* by clear and convincing evidence, that the parent's rights should be terminated. [Citation omitted.]" *In re K.W.*, 45 Kan. App. 2d 353, 354, 246 P.3d 1021 (2011).

In making this determination, an appellate court does not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008).

*The evidence supported the district court's finding of unfitness*

*The evidence*

The record begins with J.P.P. and J.J.P. being taken into custody because of filthy living conditions that included a stench sufficiently strong that the law enforcement officer who was there for the welfare check needed to step outside several times. Both photos in the record and the officer's affidavit establish the adults and children in the house lived among garbage, animal feces, and clutter. M.P. had been involved with DCF twice with her oldest child for unsafe living conditions in other homes. Both cases had been assigned for Family Preservation Services.

Even after DCF took custody of J.J.P. and J.P.P. in these cases, M.P.—living with her family—struggled for nearly two years to maintain a clean and safe home, with only a brief period of improvement. Two months into the case, SFCS case managers reported

7

M.P.'s home was infested with cockroaches. For a time, M.P. and the other adults in her home worked to reduce the clutter while SFCS set up and helped pay for pest control services. M.P. had a chore chart for a while as part of an effort to assign regular cleaning duties. Then, during the next several months, the children visited M.P. at her home but the conditions of the home deteriorated. Over time, pet feces outside attracted flies that entered the home. SFCS reported to the court that after a lapse in services because M.P. and her family had not contacted Orkin to set up planned bimonthly treatments, Orkin had returned. Orkin advised SFCS to move the treatments to monthly because of clutter and trash in the home and surroundings that prevented thorough treatment.

In November 2016, SFCS reported to the court that the agency had been providing M.P. with specific instructions on how to clean the home, address safety concerns, give the children nutritional meals, and otherwise meet the children's fundamental needs, but there had been "continued minimal progress in all areas." SFCS reported the children were playing and walking in animal feces in their play area outside. At the termination hearing, Mother testified the home where she was living still was not a good place for her children to live.

Evidence submitted at the termination hearing showed the clutter and trash endangered the children and sharp objects and choking hazards were left lying around the home during visits. In one instance, J.J.P. found a sharp knife lying around and attempted to cut open a package with it. M.P. did not intervene to stop him and, as he tried to open the package, the knife jerked backwards toward J.P.P.'s head. SFCS staff intervened since M.P. was not taking action on the safety concern. The ongoing clutter and trash also provided a breeding ground for mice. At one point, Orkin identified an infestation of mice mites, which can be the source of bites. The ongoing failure to deal consistently with the clutter and trash in and around the home proved to be a challenge to effective control of the pests.

8

Except for three months in 2017, M.P. lived in Abilene with her other family members for the duration of these cases. In the spring of 2017, M.P. moved to Salina and lived at her boyfriend's house. The children and their foster family had moved to Salina previously. M.P. applied for housing with Salina's housing authority. She testified she was at the top of the placement list, but the Salina housing authority needed a copy of her case plan for the children. M.P. said she lost her copy when she moved to Salina and reached out to multiple SFCS staff members for nearly a week through phone calls and text messages but could not get a response to her calls.

SFCS explained that an extended absence from the office by one SFCS worker and the failure of others to close the gaps contributed to the missed contact. SFCS staff also reported to the district court they had received a text from M.P. on June 5, 2017, at 4:48 p.m., stating the housing authority needed the case plan by 5:00 p.m. or she would lose her place on the list and have to reapply. As a result of being in a meeting when the request was made, the case plan was not provided in that 12-minute window. SFCS provided M.P. with a copy of the plan at a meeting on June 9 and urged her to reapply for housing. M.P. soon returned to her family's home in Abilene. She said she left her boyfriend's home because she did not believe the environment was safe for her or the children.

M.P. did reapply with Salina's housing authority shortly after returning to Abilene. However, Saline County residents have preferred placement over non-Saline county residents, making it unlikely that M.P., as a nonresident, would be offered a place. M.P. had the option of applying for temporary housing in Salina where she could stay until the housing authority found her a residence but chose not to do so. She also elected not to apply with the housing authority in Abilene.

9

*The district court findings*

Of the four statutory considerations upon which the district court based its finding of unfitness, the one that is least supported by the evidence—or for which there is the least stated support from the record—is the one upon which the court "partly" relied, K.S.A. 2017 Supp. 38-2269(b)(1), which considers a "mental deficiency . . . of such duration or nature as to render the parent unable to care for the ongoing physical, mental and emotional needs of the child." However, after hearing the evidence, the district court specifically found SFCS "provided support and instruction through their strengthening family program in regard to how to care for the minor children," and M.P. appeared to learn but then regressed when back around the other adults in her family. Hospital staff were concerned about M.P.'s apparent inability to learn the concepts for care of her newborn, J.P., despite repetition. Although M.P. contends more should have been done to accommodate her disability, the record does not support an argument that it was disregarded.

In contrast, however, we find the evidence supporting the other three grounds upon which the district court relied. K.S.A. 2017 Supp. 38-2269(b)(8), (c)(1), and (c)(3), viewed in the light most favorable to the State, is such that a rational fact-finder could have found it to be clear and convincing proof that M.P.'s parental rights should be terminated.

By the time of the hearing on the State's motion to terminate, the two older children had been out of the home for 21 months and the youngest, since her birth almost 16 months prior to the hearing. The principal cause for the initial removal of the children was the trash-strewn and unsanitary condition of the home; at the termination hearing M.P. acknowledged that, although the mice and insect problems had improved, the house was not a good place for the children to live at that time and she had no alternative living arrangements. The record does show a period of improvement in the months after

10

removal of the children from the residence M.P. shared with her family members. But it also shows, over time, a reversion to levels of trash, clutter, and animal feces in play or living areas that made pest control difficult and created breeding opportunities for flies, mice, and associated pests. The district court also found the oldest child had been the subject of two previous cases in which Family Preservation services were offered, both of which involved unhealthy living conditions.

The district court found that "[t]he significant event in this case that turned a possible positive reintegration into an almost impossible situation occurred on June 8, 2016," the date on which M.P. unexpectedly gave birth to J.P., a full-term daughter, at her home. The court found that during supervised visits SFCS instructed M.P. on how to interact with J.P.P. and J.J.P. and pay attention to them, and also instructed her on how to clean the children and feed them nutritious meals. Nonetheless, the district court found M.P. failed to demonstrate an ability to attend to their most fundamental needs, shown by M.P.'s inability to properly clean and diaper J.P., although she was her third child, and she did not respond to J.P.'s choking during a feeding, requiring intervention by the SFCS worker. The record also shows M.P.'s failure to appreciate the danger of J.J.P. attempting to use a sharp knife, a situation exacerbated by the proximity of his sibling. Once again, SFCS intervened for safety. The district court found that M.P.'s demonstrated abilities with the children diminished as she deferred to the other adults in her home to carry out parenting tasks.

M.P. maintains that if SFCS had responded timely to her request for a copy of her case plan to be sent to the housing authority in Salina, she could have obtained her own residence for her and the children. In isolation, the failure of the DCF contractor to respond to such a simple request over the course of a few days is without excuse. And, SFCS admits a failure in their case coverage. In context, however, the record presents a more complex view. The district court found that SFCS had urged M.P. to apply for housing for some time, especially in light of the inability under DCF rules to place the

children in a home with the maternal grandmother, who had been substantiated for neglect. When M.P.'s text request was finally received, 12 minutes remained before the deadline. SFCS immediately urged her to reapply and provided the case plan to her, but M.P. instead moved back into the family residence in Abilene.

The district court specifically found the failure by SFCS to communicate as it should have in response to M.P.'s request was "unsatisfactory," but the court did not find it to be a pivotal event. After considering the evidence, the court found "if [M.P.] were to find another residence . . . the Court does not believe that she is able to live on her own and take care of herself, much less provide for three . . . minor children." The district court cited to the facts that SFCS provided the case plan and encouraged her to reapply, "but [M.P.'s] plans were already made and . . . she was moving back home." And the court also pointed to the effort by SFCS to get M.P. to live in temporary housing in Salina so she could reapply for housing there while SFCS set her up to parent the children by herself in another living environment. M.P. declined that suggestion and told the court she "didn't know how it would look on [her] case to be living in the homeless shelter."

Viewed in the light most favorable to the State, the apparent inability of M.P., over the almost two-year course of the case, to sustain a minimally clean and sanitary home and to appreciate and provide for the care and safety needs of her children, constituted a basis upon which a rational fact-finder could find it highly probable that M.P. was unfit by conduct or condition that rendered her unable to care properly for her children. The persistence of the problem, extending back through prior Family Preservation efforts, clearly supports a finding that the conduct or condition was unlikely to change in the foreseeable future.

Upon making a finding of unfitness of the parent, "the court shall consider whether termination of parental rights as requested in the petition or motion is in the best interests of the child." K.S.A. 2017 Supp. 38-2269(g)(1). In making such a decision, the

12

court shall give primary consideration to the physical, mental, and emotional needs of the child. K.S.A. 2017 Supp. 38-2269(g)(1). The district court is in the best position to make findings on the best interests of the children; its judgment will not be disturbed absent an abuse of discretion. *In re K.P.*, 44 Kan. App. 2d 316, 322, 235 P.3d 1255 (2010). "A district court abuses its discretion when no reasonable person would agree with its decision or the decision is based on a legal or factual error." *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 2, 336 P.3d 903 (2014).

In its conclusion, the district court found termination was in the best interest of the children, because "the minor children of [M.P.] deserve a stable, safe environment, and that since July 29, 2011, when Family Preservation was first involved with [J.J.P.], that it is obvious over these six . . . years, that M.P. is unable to provide a stable home environment for the minor children." Based on the evidence cited by the district court, we certainly cannot say no reasonable person would agree with the conclusion that it was in the best interest of the children to seek permanence elsewhere. The evidence showed little to no such safety and stability in their maternal home throughout the lives of these children.

M.P.'s argument that there was not clear and convincing evidence supporting the district court's finding that she was unfit is not persuasive when reviewing the record in light of the applicable standard of review. And, while M.P. claims there was no evidence showing the children were physically harmed by the condition of her home or by her parenting when they were in her care, and there was "no professional testimony at the termination hearing that M.P.'s conduct or condition was unlikely to change in the foreseeable future," the district court's findings are supported by the clear and convincing evidence that was presented. It is not our role to reassess the weight given to the evidence presented to the district court, but to measure that court's findings and conclusions against the standard of review.

13

Affirmed.